**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR13-00674-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Primativo Escobar-Benitez, | |
| Defendant. | |

Defendant Primativo Escobar-Benitez has filed a motion to suppress. Doc. 27. The motion is briefed, and the Court held an evidentiary hearing on November 27, 2013. This order includes facts agreed to by the parties and factual findings from the testimony and exhibits presented during the hearing. For the reasons set forth below, the Court will deny the motion to suppress.

**I.     RELEVANT FACTS.**

On April 2, 2013, investigators with Homeland Security Investigations ("HSI") executed a federal search warrant on apartment 192 of the complex located at 3838 East Camelback Road in Phoenix, Arizona. The apartment was being used as a "stash house" for illegal aliens being smuggled into the country, and a total of 16 undocumented persons were apprehended. The person responsible for operating the stash house, Lucio Castillo-Castillo, subsequently advised investigators that another apartment in the same complex was used as a stash house. Castillo-Castillo identified two adjacent apartments as possibilities, including apartment 98. After speaking with management at the apartment complex, HSI investigators decided to inquire at apartment 98.

1      On April 18, 2013, at approximately 6:15 a.m., agents conducted a "knock and
2 talk" at apartment 98.  Two agents approached the front door and knocked.  A male
3 voice, speaking Spanish, asked "who is it?"  The agents responded in Spanish that they
4 were police officers and would like to speak with the persons inside.  Two minutes
5 passed with no further communication and no visual contact with any occupants.

6      Multiple HSI agents had stationed themselves behind the apartment before the
7 knock and talk was initiated.  These agents stood outside a block wall that enclosed a rear
8 patio.  The agents who knocked on the front door notified the agents in back as they were
9 about to initiate the knock and talk.

10     The agents in back saw the back door of the apartment open quietly.  Two males
11 emerged and began running across the patio toward a partially-open gate in the block
12 wall.  Agents standing just outside the gate and wall pointed their guns at the two men
13 and commanded them to stop.  One of the men, later identified as Defendant, stopped just
14 short of the gate.  The other ran back into the apartment, leaving the back door ajar.

15     Agents directed Defendant to walk through the gate, where they placed him in
16 handcuffs.  Agents then gave loud commands to the other individual to exit the
17 apartment.  When the individual did not do so, agents entered the patio, surrounded the
18 back door, and again gave commands for the individual and anyone else in the apartment
19 to exit.  When nobody exited, agents entered through the open back door and proceeded
20 room-by-room to clear the premises.  They found the individual who had run back into
21 the apartment hiding in a bathroom, and another 11 adults hiding in two closets.  All
22 occupants eventually admitted that they were illegal aliens.

23     Agents secured the apartment and applied for a search warrant.  Upon receiving
24 the warrant at approximately 4:30 p.m., agents searched the apartment and found various
25 items of evidence relevant to this case.

26     Defendant contends that the agents seized him unlawfully when they commanded
27 him to stop, directed him to walk through the gate, and then placed him in handcuffs.
28 Defendant also contends that agents violated the Fourth Amendment when they entered

the apartment without a search warrant and discovered the persons hiding inside.

## II.     STOP OF DEFENDANT.

Defendant asserts that he was within the curtilage of the apartment when he was stopped by HSI agents, that he therefore was within his home for purposes of the Fourth Amendment, and that agents cannot execute an investigative stop inside a home. Because the agents did not have probable cause to arrest him, Defendant contends, his detention in the patio area violated the Fourth Amendment.

The government argues that the stop and detention were lawful. The government also argues that Defendant had no reasonable expectation of privacy in the apartment, and that his Fourth Amendment rights therefore could not have been violated by the actions of the HSI agents. The Court will address this argument first.

### A.     Reasonable Expectation of Privacy.

When Defendant was detained, he was in possession of keys to the apartment. No other person was found with keys. Defendant advised agents that he had been entrusted with the apartment by an individual named Sedamo-Ortega, and that Sedamo-Ortega left for New York approximately five days earlier. Defendant asserted that he had been maintaining the apartment and had possessed food and drinks within the apartment that he sold to the illegal aliens who were present. Defendant stated that a man wearing a mask would come to the apartment at night, provide him with additional food, and pay him $25 to keep the apartment clean. Sedamo-Ortega had advised Defendant that illegal aliens would be brought to and taken from the apartment at night. In addition, neighbors reported that someone who looked like Defendant had been seen driving a vehicle that was parked behind the apartment. Agents later determined that Defendant did not own the vehicle.

Defendant argues that he had a reasonable expectation of privacy in the apartment because he qualified as an "overnight guest." *See Minnesota v. Carter,* 525 U.S. 83, 90 (1998). The Supreme Court has held that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of

the householder may not." *Id*. at 90.  Courts applying *Carter* to similar cases have held that a person qualifies as an overnight guest only if the individual is an invited guest, authorized to be in the house by someone with lawful control of the premises.  *See United States v. Gonzales-Barrera*, 288 F. Supp. 2d 1041, 1050 (D. Ariz. 2003); *see also United States v. Vasquez*, 706 F. Supp. 2d 1015, 1023 (C.D. Cal. 2010); *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1341-42 (N.D. Ga. 2009).

The government presented evidence at the hearing that apartment 98 was leased by Jose Ramirez-Perez, Mario Estrada, and Mecanica Estrada.  Ex. 10.  The application submitted by these individuals also included references from Antonio Lopez and Jose Romero.  The application was signed by Jose Ramirez.  *Id*.  Defendant presented no evidence that Sedamo-Ortega was lawfully in possession or control of apartment 98, nor that any of the individuals named in the rental application authorized him to stay at the apartment.  Thus, Defendant has presented no evidence that he was an invited guest at the apartment by someone who had lawful authority over it.  As the court concluded in *Gonzales-Berrera*, "defendant's concession that no one had given him permission to stay in the house is an important factor that takes this case outside the ambit of [the overnight guest rule].  Absent a showing that he was an invited guest, defendant has not borne his burden of proving that he had a legitimate expectation of privacy in the house." *Gonzales-Berrera*, 288 F. Supp. 2d at 1050.

The Court will not recount the full analysis set forth in *Gonzales-Berrera*, nor the additional authorities cited in *Vasquez* and *Rodriguez-Alejandro*.  Suffice it to say that the Court agrees with the analysis in these cases, and that Defendant has presented no evidence to suggest that he was a legitimate occupant of apartment 98 when the HSI agents arrived on April 18, 2013.  Because Defendant had no legitimate expectation of privacy in apartment 98, he also lacked a legitimate expectation of privacy in the curtilage.  Thus, a valid investigative stop of Defendant while located in the curtilage could not be deemed a violation of his Fourth Amendment rights.

/ / /

**B.     The Investigative Stop Was Valid.**

The Ninth Circuit has made clear that the curtilage of a home is entitled to the same Fourth Amendment protection as the home itself, and that law enforcement officers may lawfully enter the curtilage on the same terms as they may lawfully enter the home. *United States v. Perea-Ray*, 680 F.3d 1179, 1186 (9th Cir. 2012).  The Ninth Circuit has also held that the investigative or *Terry* stop exception to the warrant requirement "does not apply to in-home searches and seizures." *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  As a result, Defendant argues that no valid *Terry* stop could have been made when he was still located within the curtilage of the apartment, that HSI agents did not have probable cause to arrest him at that time, and that his seizure was therefore unlawful.  The Court does not agree.

As noted above, Defendant had no reasonable expectation of privacy in the apartment and patio.  His stop while physically located within the curtilage therefore did not violate his Fourth Amendment rights.  Moreover, even if Defendant had a reasonable expectation of privacy in the premises, the Court concludes that the *Terry* stop was valid.

The Ninth Circuit has held that a *Terry* stop may be made at the threshold of a home:  "we now hold that when a suspect voluntarily opens the door of his residence in response to a non-coercive 'knock and talk' request, the police may temporarily seize the suspect outside the home (or at the threshold) provided that they have reasonable suspicion of criminal activity.  If an arrest in the doorway is allowed, certainly the lesser intrusion of a *Terry* stop . . . is also permissible."  *United States v. Crapser*, 472 F.3d 1141, 1148 (9th Cir. 2007).  In *Perea-Ray*, one of the principal cases relied on by Defendant, the Ninth Circuit confirmed the correctness of the holding in *Crapser*.  The Court of Appeals explained that the suspects in *Crapser* and similar cases "knowingly and voluntarily exposed themselves to police officers," making a *Terry* stop lawful. *Perea-Ray*, 680 F.3d at 1188 n.5.  The Ninth Circuit further explained that, "[u]nlike a private yard or carport, tenants in an apartment building or motel have no justified expectation of privacy as to a portion of the home which all residents and visitors must

use to enter, the common yard open to the public or the parking lot open to all users of the apartment building." *Id*. (citation omitted).

In this case, Defendant exited the back door of the apartment and began running across the patio toward the gate that led to the common parking lot of the apartment complex. Agents commanded Defendant to stop, and he came to a halt two feet or less before he reached the partially-open gate. This fact is captured in photographs taken at the time; indeed, it appears Defendant was stopped as he reached out to push open the gate and enter the parking lot. *See* Exs. 5, 6. Defendant, who admits that he was the person who spoke to officers through the front door when they announced the knock and talk, voluntarily chose to exit the apartment and run toward the parking lot, an area the Ninth Circuit has identified as lacking any reasonable expectation of privacy. *Perea-Ray*, 680 F.3d at 1188 n.5. By this action, Defendant knowingly and voluntarily exposed himself to police officers. The fact that officers commanded Defendant to stop as he was running out of the patio, and that he came to a halt just short of the gate, does not have constitutional significance. Defendant clearly was exiting the apartment and the curtilage, was fleeing from the officers he knew were at the front door, and was stopped only upon command of the officers waiting in the parking lot. Given Defendant's clear intention and efforts to flee the premises, the Court concludes that he had no greater constitutional protection than he would have had if he had opened the front door. If he could be detained under *Terry* at the front door as *Crapser* holds, 472 F.3d at 1148, he certainly could be detained under *Terry* as he fled out the back door and patio.[1]

The HSI agents clearly had sufficient grounds for a *Terry* stop. Law enforcement officers may stop and detain an individual if they have reasonable suspicion to believe that criminal activity is occurring, based on the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Terry*, 392 U.S. at 27. In this case, agents had reason to believe from their interview of Castillo-Castillo and their discussions with the

---

[1] In contrast, the suspect in *Perea-Ray* made no effort to leave the curtilage. 680 F.3d at 1186-88.

apartment's management that apartment 98 may be involved in alien smuggling. The agents knocked on the front door and asked to speak with the occupants. Shortly thereafter, Defendant quietly stepped out of the back door and began running to the parking lot. The individual running with Defendant, after seeing law enforcement officers, turned and ran back in to the apartment. Based on these facts, the officers had a reasonable basis to suspect that Defendant may be involved in alien smuggling. A *Terry* stop was entirely warranted.

In summary, the Court concludes that the stop of Defendant did not violate his constitutional rights even if he did have a reasonable expectation of privacy in the apartment and patio.[2]

**III.    SEARCH OF THE APARTMENT.**

Because Defendant did not have a reasonable expectation of privacy in the apartment, he cannot complain about its search. Even if he did have a reasonable expectation, however, the Court finds that the limited search was justified by exigent circumstances.

The parties agree that the relevant test is set forth in *United States v. Snipe*, 515 F.3d 947 (9th Cir. 2009). The Court must consider two factors: "whether (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *Id.* at 952.

The test is easily satisfied in this case. As noted above, agents learned that apartment 98 or the apartment next to it was being used as an alien stash house. When agents knocked on the door, announced their presence, and asked to speak to the occupants, Defendant and another fled out the back. The second individual saw the officers, did not stop, and ran back into the apartment. HSI Special Agent Timothy

---

[2] The fact that agents placed Defendant in handcuffs during the investigatory stop did not transform it into an arrest. *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).

Hemker testified at the hearing that he immediately became concerned for the safety of individuals in the apartment. He noted that agents believed this was a stash house, a fact corroborated by the occupants' refusal to open the front door and the attempt of Defendant and another male to flee. Agent Hemker knew that smuggled aliens were often held in stash houses against their will and under armed guard. Agent Hemker also knew there was a school nearby and that individuals fleeing from the apartment could potentially pose a risk to the school. In light of these circumstances, Agent Hemker and others entered the apartment to secure any persons inside. Clearly, the agents had objectively reasonable grounds for concluding that there was a need to enter the apartment and protect any individuals who may be held against their wills, and to apprehend anyone who might pose a threat to the surrounding area, including the nearby school. The Ninth Circuit reached the same conclusion in a similar case. *See United States v. Reyes-Bosque*, 596 F.3d 1017 (9th Cir. 2010).

The Court also concludes that the scope and manner of the entry were reasonable. Officers entered the apartment with guns drawn, moved slowly through each room to clear the apartment, found the individual who had returned to the apartment hiding in the bathroom, and found 11 other adults hiding in two closets. Agents took these individuals into custody, secured the apartment, and obtained a search warrant before conducting further searches of the premises. The agents did only as much as was necessary to secure the occupants of the apartment and ensure their safety and the safety of others.

**IT IS ORDERED** that Defendant's motion to suppress (Doc. 27) is **denied**. Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from 9/9/2013.

Dated this 3rd day of December, 2013.

_____
David G. Campbell
United States District Judge